780 F.2d 1022
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)
MARIE PETRY, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 83-1336
 United States Court of Appeals, Sixth Circuit.
 11/8/85
 
 REVERSED AND REMANDED
 W.D.Mich.
 On Appeal from the United States District Court for the WESTERN District of Michigan
 Before: KEITH and KRUPANSKY, Circuit Judges, and PECK, Senior Circuit Judge.
 PECK, Senior Circuit Judge.
 
 
 1
 On September 22, 1978, appellant Marie Petry filed an application for widow's disability insurance benefits under Sec. 202(e) of the Social Security Act, 42 U.S.C. Sec. 402(e). Petry was born on January 15, 1929; her husband died on September 6, 1975. She alleged disability due to back pain and emotional problems. Her application was denied initially and upon reconsideration by the Bureau of Disability Insurance of the Social Security Administration. A de novo hearing was held before an Administrative Law Judge (ALJ) on September 19, 1979. Petry was not represented by counsel at this hearing. Subsequent to the hearing, the ALJ submitted all of the medical exhibits, a summary of Petry's testimony, and a set of interrogatories which requested specific answers to Dr. Richard Bates, a board certified internist employed as a medical advisor to the Office of Hearings and Appeals of the Social Security Administration. Dr. Bates responded that Petry's impairments 'neither alone, nor collectively, were the medical equivalent of the impairments listed in the Appendix to Subpart P of Regulation No. 4.'[1] The ALJ stated that he was 'bound by Dr. Bates' conclusion on this issue' and, consequently, held that Petry was not entitled to benefits. The denial of benefits was affirmed by the Appeals Council. Petry appealed to the district court pursuant to Sec. 205(g) of the Social Security Act, 42 U.S.C. Sec. 405(g.) The district court found that the decision of the Secretary was based on substantial evidence and granted the Secretary's motion for summary judgment. We reverse and remand for further proceedings.
 
 
 2
 The evidence introduced at the hearing before the ALJ established that Petry sustained back injuries when a tornado struck her home in 1974; in 1975 she underwent a laminectomy and discectomy to correct a herniated disc. In December 1977, she received emergency room treatment for chest pain; the impression was subdiaphragmatic pleurisy, liver cirrhosis, and hypokalemia. In January 1978, Dr. Henry Doorn filed a disability statement in which he diagnosed menopausal syndrome, chronic bronchitis, and back pain. No significant laboratory or clinical information accompanied the statement. In June 1978, Petry was treated for stomach and abdominal pain; an upper G.I. series was performed and the results were normal. On June 20, 1978, Dr. James Boss submitted a report which stated that he had treated Petry from September 1977 through January 1978. He diagnosed emotional instability, moderate hypertension, menopausal syndrome, and possible diverticulitis. Dr. Boss stated that Petry's range of motion was restricted to 10-15 degrees in the cervical area and that she experienced moderate to severe pain on rotation and side bending. On July 10, 1978, Petry was evaluated by Dr. Stanley Rabinowitz, an internist, who diagnosed hypertension, chest pains, chronic bronchitis, osteoarthritis of the right and left hand, mild anxiety neurosis, and chronic low back pain syndrome. Dr. Rabinowitz was of the opinion that although Petry complained of anxiety, her ability to relate to others was not impaired. In October 1978, a neurological
 
 
 3
 The judgment of the District Court is affirmed for the reasons stated below.
 
 
 4
 Plaintiff Hoesch filed a three-count complaint against CNB and Wire & Bar Products, Inc., a Michigan corporation (hereinafter 'W & B').
 
 
 5
 Counts I and II were against W & B and Count III was against CNB.
 
 
 6
 In Count I of its complaint, Hoesch alleged that Frederick J. Katz (hereinafter 'Katz'), was the Chief Executive Officer in control of USP Industries, Inc., a Michigan corporation (hereinafter 'USP'). Further, Katz was also the chief executive officer and controlling shareholder of W & B.
 
 
 7
 On or about March 2, 1979, USP executed a security agreement giving Hoesch a security interest in the accounts receivable of USP, all inventory received from Hoesch by USP and the proceeds of both.
 
 
 8
 Hoesch further alleged that USP, without knowledge or consent of Hoesch, conveyed some of the merchandise it purchased from Hoesch to W & B at a time when USP was insolvent. These conveyances were made at a time when Katz was the chief executive officer and in control of both USP and W & B. Hoesch alleged that W & B knew that USP was insolvent at the time of the conveyances.
 
 
 9
 It is further alleged that these conveyances were fraudulent as to Hoesch under the Uniform Fraudulent Conveyance Act, MSA 26.881, et seq.
 
 
 10
 Hoesch asked for judgment in its favor and against W & B setting aside the conveyances to the extent necessary to satisfy Hoesch's claim against USP.
 
 
 11
 In Count II, Hoesch alleged that USP willfully and without knowledge, consent, or authorization of Hoesch transferred to W & B inventory of USP that was subject to Hoesch's security interest. Hoesch's security interest continued in the inventory after the transfer. The inventory was then sold by W & B, giving rise to accounts receivable from W & B's customers to W & B. Hoesch alleged that the receivables are the proceeds of inventory sold by Hoesch to USP and therefore subject to Hoesch's security interest.
 
 
 12
 Hoesch sought judgment against W & B requiring W & B to account to Hoesch for all inventory transferred from USP to W & B; pay to Hoesch treble damages of all of the inventory accounts and other property in which Hoesch had a security interest and account to Hoesch for all accounts receivable and other proceeds of the inventory subject to Hoesch's security interest.
 
 
 13
 Count III of the complaint alleged that CNB has claimed a security interest in the accounts receivable of W & B and has received from W & B the proceeds of W & B's receivables.
 
 
 14
 Hoesch further alleged that the proceeds received by CNB included proceeds of accounts in which Hoesch had a security interest, and that CNB, by failing or refusing to account and pay over to Hoesch the amounts received by CNB in which Hoesch has a security interest, has converted Hoesch's property.
 
 
 15
 Hoesch asked the District Court to enter judgment in its favor against CNB requiring CNB to account and pay over to Hoesch all proceeds collected with respect to accounts receivable subject to the security interest of Hoesch.
 
 
 16
 In response to the complaint, the defendant CNB filed an answer neither admitting nor denying the principal allegations but leaving them to the plaintiff's proofs.
 
 
 17
 CNB admits that it had a security interest in the accounts receivable of W & B and that it properly collected these receivables. Further, CNB alleges that its security interest in W & B's accounts receivable was prior to the plaintiff's.
 
 
 18
 CNB alleges that at all times Hoesch was aware of CNB's actions and at no time did Hoesch give CNB notice of any claim, and that CNB's security interest was prior to plaintiff's in W & B's accounts receivable and assets.
 
 
 19
 Finally, CNB denies that Hoesch has any interest in the monies or funds received by CNB from W & B.
 
 
 20
 Further, CNB has set forth several affirmative defenses as follows:
 
 
 21
 1. CNB had a valid security interest in the inventory and accounts receivable of W & B and such security interest was prior to Hoesch in that it was filed and perfected on April 4, 1979, whereas Hoesch never filed its security interest until May 15, 1980.
 
 
 22
 2. CNB is a bona fide purchaser for value and/or a holder in due course and takes free of the personal defenses of Hoesch.
 
 
 23
 3. Hoesch, at all times during CNB's collection of the receivables of W & B, did nothing to effect collection, that is, put the accounts receivable debtors on notice nor did it put CNB on notice of its claim. Thus, Hoesch is estopped from making any claim against CNB.
 
 
 24
 W & B, the defendant in Counts I and II, did not file any responsive pleading by motion or by answer and a default judgment has been taken by Hoesch against W & B. W & B is not a party to this appeal.
 
 
 25
 During the time the case was pending, the parties filed and responded to interrogatories, requests for production of documents, and requests for admissions. In addition, depositions were taken of various employees, officers, and representatives of Hoesch, USP, CNB, and W & B.
 
 
 26
 Plaintiff Hoesch filed a motion for summary judgment on January 6, 1983, against CNB. Attached to Hoesch's motion for summary judgment were portions of the deposition of John T. Garr, a copy of CNB's amended answers to the plaintiff's request for admissions, a copy of the February 27, 1979, security agreement between Hoesch and USP, and a copy of the credit analysis of W & B dated March 15, 1979.
 
 
 27
 CNB filed a motion for partial summary judgment against Hoesch on February 16, 1983. Attached to CNB's motion for summary judgment is the affidavit of Lucille Comartin, an employee of CNB, and an affidavit of Amy Conner, a former employee of W & B from the period May 1979 to August 1980.
 
 
 28
 Hoesch claimed that since it had a perfected lien on the assets of USP, the lien followed the steel sold by it into the hands of W & B. Hoesch further argued its lien then attached to the accounts receivable, then to the checks which CNB received from W & B allegedly arising from the sale of Hoesch steel. Hoesch claims CNB converted the collateral of Hoesch by cashing the checks delivered to it by W & B.
 
 
 29
 CNB had alternative arguments. The first was that some of Hoesch's sales were directly to W & B and, thus, not subject to Hoesch's security interest on steel sold to USP. Alternatively, CNB contended that Hoesch was aware of and approved the practices by which USP transferred some of the Hoesch steel to W & B and thus that steel was not subject to Hoesch's security interest under MSA 440.9306.
 
 
 30
 A hearing was held on the motions for summary judgment before the District Court on March 10, 1983.
 
 
 31
 The District Court had before it at the time it ruled on the cross-motions for summary judgment the pleadings, answers to interrogatories, documents submitted by the parties, admissions, affidavits, and the depositions together with the briefs of the parties.
 
 
 32
 At the end of the oral hearing on the cross-motions for summary judgment, the District Court made the following findings from the bench:
 
 
 33
 THE COURT: Think you. If I pretend my neighbor's wife is mine, it doesn't make her my wife.
 
 
 34
 What you have here, there isn't any question that somebody at Hoesch wanted to pretend they were selling, for whatever reason, whether they were trying to deceive them or what I don't know, trying to pretend they were selling to themselves, that they were selling steel to--that they were really selling it to somebody else.
 
 
 35
 I don't see any possible theory under any possible construction of the facts under any theory of law by which Hoesch can reach out to the bank and try to get money that the bank received from Wire and Bar who was selling steel with Hoesch's knowledge.
 
 
 36
 Hoesch had a bookkeeping transaction. They pretended they were selling the property to somebody else but they knew different all the way along. I think it's just somebody at Hoesch had their head in the sand as far as what was going on. They wanted to pretend--they had a security interest with one company so they pretend, 'Well, let's charge it on the books to a different company because we have a security interest in them.
 
 
 37
 All of the evidence indicates Hoesch knew very well what was going on, that they were selling steel to two different companies, the Wire and Bar was paying them for it, the bank was treating Wire and Bar as a separate entity; there is no indication to the contrary.
 
 
 38
 You can take any theory you want. I don't think there is any conceivable legal or factual claim that Hoesch would have against the bank for the money and I grant your motion for summary judgment.
 
 
 39
 On April 29, 1983, the District Court entered judgment denying plaintiff Hoesch's motion for summary judgment, granting the defendant CNB's motion for partial judgment, and dismissing the complaint against CNB with prejudice.
 
 
 40
 In granting CNB's motion for summary judgment and denying Hoesch's motion for summary judgment, the trial Court only ruled on the conversion issue raised in Count III of the complaint and did not address the affirmative defenses raised by the defendant CNB.
 
 
 41
 Because the trial Court only decided the conversion issue and did not make determinations in regard to the affirmative defenses, it is not necessary to address those issues in this appeal.
 
 
 42
 Simply stated, Hoesch has two arguments in this appeal.
 
 
 43
 The first is that the District Court erred in not granting its motion for summary judgment on the conversion issue because there is no material issue of fact that CNB converted Hoesch's property and, therefore, Hoesch is entitled to judgment as a matter of law.
 
 
 44
 Alternatively, Hoesch is arguing that the District Court erred in granting defendant CNB's motion for summary judgment because there is a material issue of fact as to whether Hoesch consented or authorized the sale or other disposition of the steel from USP to W & B for sale to W & B's customers.
 
 
 45
 Fed. R. Civ. P. 56(c) provides in substance that a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 46
 This Court has reviewed all of the pleadings, the answers to interrogatories, documents, admissions, affidavits, depositions, and briefs of the parties and concludes that there is no material issue of fact, and that defendant CNB is entitled to judgment as matter of law on its motion for summary judgment.
 
 
 47
 Following are the undisputed relevant facts.
 
 
 48
 W & B was founded in 1975 by Katz to act as a steel broker selling primarily to automotive suppliers. Upon receipt of an order from one of its customers, W & B would purchase the required grade, size and guantity of steel from one of a number of sources including Hoesch, then resell the steel to its customer. At all times material to this lawsuit, Katz was the sole shareholder of W & B.
 
 
 49
 In 1977, Katz, along with three other investors, formed USP to process and sell steel to automotive suppliers. USP operated along the same lines as W & B except that USP had the equipment necessary to perform certain processing operations such as drawing steel rods down to a different size, straightening coiled steel and cutting steel to specified lengths. At all times material to this suit, Katz was a 25 percent shareholder of USP and was its chief executive officer.
 
 
 50
 USP and W & B shared office space, and employees of W & B were mixed in with employees of USP, in such a manner that an observer would not know that two corporations were operating out of one office.
 
 
 51
 Katz testified in deposition that he discussed the formation of USP with Karl Stehr (hereinafter 'Stehr'), president of Hoesch, informing him about the type of product USP would offer and the type of customer USP would service. Stehr informed Katz that Hoesch would not sell to two Katz controlled entities and would restrict its sales to USP only. Stehr then introduced Katz to Intercontinental Metals Corporation, an entity which had no relationship with Hoesch, in order that Intercontinental could replace Hoesch as W & B's principal steel supplier.
 
 
 52
 However, Katz further testified in deposition that Stehr told him, in reference to the relationship between USP and W & B that 'I don't know where it is going to go [Hoesch steel] but we have to bill USP.'
 
 
 53
 In February 1979, USP executed a security agreement granting Hoesch a security interest in the accounts receivable of USP and in all inventory which Hoesch sold to USP, as well as a security interest in the proceeds of the collateral. That security interest was perfected on March 12, 1979 and Hoesch's status as a perfected secured creditor of USP is not disputed.
 
 
 54
 Despite the fact that all of the sale confirmations were signed by Katz on behalf of USP, some of the steel which USP bought from Hoesch was recorded on W & B's books as a direct purchase by W & B from Hoesch. When the Hoesch invoice to USP arrived, Katz would examine the invoice to determine whether the steel was to be resold to a customer of USP or W & B. If the steel was to be resold to a customer of USP, USP would record the purchase and resale of the steel on its books. On the other hand, if the steel was resold to a W & B customer, Katz would cross USP off the invoice, write in W & B, and run the purchase and resale of the steel through W & B's books.
 
 
 55
 Upon USP's request, Hoesch would authorize the warehouseman to release particular quantities and grades of steel and then invoice USP for the steel so released. In some cases, Hoesch would approve the release of the steel to 'USP'; in some cases to 'W & B'; and in some cases to 'USP/W & B.' Additionally, the evidence revealed that Hoesch was paid on numerous occasions by W & B checks for steel delivered to W & B in the total amount of $800,000.
 
 
 56
 In March 1979, CNB extended a revolving line of credit to W & B secured by a floating lien on all inventory and accounts receivable. CNB perfected its security interest in the assets of W & B on March, 23, 1979. Pursuant to this line of credit, W & B could borrow the lesser of $250,000 or 70 percent of eligible accounts receivable. When W & B received payments from its customers, it would deliver the checks as received directly to CNB. CNB would process the checks W & B delivered and apply the proceeds to reduce W & B's loan balance. CNB would, if requested, reloan some or all of the money W & B had surrendered.
 
 
 57
 Early in 1980, CNB conducted an audit of W & B. On February 26, 1980, Mr. Schuster, CNB auditor, prepared a written report of his investigation. Schuster, in regard to the inventory of W & B, noted:
 
 
 58
 This brings us around to the inventory. The bank did a lien search on USP Industries, Inc. and found that Hoesch America has a secured interest in the inventory and receivables of USP Industries. Mr. Katz informed me at the pre-loan audit that he has a 25% interest in USP. We went out to the company to verify who purchased the merchandise from Hoesch America. The invoices from Hoesch, were all made out in the name of USP Industries. However, the purchases for much of the inventory were reflected on the Purchase Journal for Wire & Bar par Tom Muneio [another CNB auditor].
 
 
 59
 To the best of our knowledge, the inventory purchased by USP from Hoesch for Wire & Bar is reflected on the financial statements for Wire & Bar Products. (Emphasis supplied.)
 
 
 60
 Schuster questioned Katz about the transactions and Katz replied that the transactions had been condoned by Hoesch.
 
 
 61
 A month later, on March 27, 1980, Werner Schulte-Derne, Hoesch's sales manager, conducted an audit of both USP and W & B to determine the financial status of the two companies. During this audit Derne discovered that W & B was recording the direct purchase of steel from Hoesch. When questioned by Derne concerning the accounting entries, Katz explained that some material was the subject of inter-company sales and that the records indicating direct steel purchases by W & B from Hoesch were in error. Katz then confirmed that all transactions were between Hoesch and USP and that it was erroneous for W & B to have recorded any direct purchases from Hoesch. Mr. Schulte-Derne then instructed Katz to record all purchases from Hoesch properly and show them only on USP's books. On April 15, 1980, Hoesch filed a financing statement with W & B as a debtor and perfected it in May 1980.
 
 
 62
 Thereafter, Hoesch retained William J. Wetmore, an independent certified public accountant, to monitor the financial affairs of USP and W & B. Wetmore was asked to examine the books of both USP and W & B to determine which receivables on the books of W & B arose from the sale of Hoesch steel, and to review cash collections of both W & B and USP to separate those W & B collections which arose frm the sale of Hoesch steel from other W & B collections which were CNB's collateral. Despite Katz's assurances that he would follow Mr. Wetmore's instructions, the procedure Katz used of recording the purchase and sale of Hoesch steel on W & B's books did not change.
 
 
 63
 In September 1980, W & B ceased operations. USP did likewise on October 31, 1980 when it voluntarily surrendered its assets to Hoesch. On the date the turnover occurred, a CNB vice-president appeared at the office of USP. Hoesch cooperated with CNB in segregating the W & B assets from the USP assets and making the W & B assets available to CNB. Hoesch liquidated the remaining USP assets and reduced its loss to $1,360,111.49.
 
 
 64
 The District Court's finding and judgment can be interpreted in either of two ways which both produce the same result.
 
 
 65
 The first is that Hoesch sold steel directly to W & B. Hoesch did not have a security interest in that steel, accounts receivable, inventory, or proceeds of sale until May 1980. CNB did have a perfected security interest in the W & B inventory, accounts receivable, and proceeds of sale as of April 1979. Thus, there was no conversion by CNB.
 
 
 66
 The other interpretation is that if Hoesch had a security interest, it lost it because of MSA 440.9306(2).
 
 MSA 440.9306(2) provides as follows:
 
 67
 (2) Security interest; continuance in collateral or identifiable proceeds. Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor. (Emphasis added.)
 
 
 68
 This section clearly provides that if a creditor, having a perfected security interest, authorizes a sale, exchange or other disposition by a debtor, the security interest is terminated.
 
 
 69
 Clearly, the statute continues the secured party's security interest, both in the collateral in the hands of a buyer as well as the proceeds received by the borrower from an unauthorized sale of the collateral. The security interest can be lost, however, and is lost if the sale is authorized by the secured party in the security agreement, or otherwise. See National Livestock Credit Corp. v. Schultz, 344 UCC Rep. 317 (Ok. App. 1982).
 
 
 70
 Further, the Court is not limited to looking only at the words used by the parties to the transaction but to analyze their conduct as well in determining what agreement they actually made and what the equities should be. See National Livestock Credit Corp. v. Schultz, supra.
 
 
 71
 In a case where creditors had perfected security interests in cattle sold to a defendant at an auction but the creditors had consented to the auction sale of the cattle under section 9.306 of the UCC, their security interests were released by the sale and were not enforceable against the defendant. See Wright v. Vickaryous, 28 UCC Rep. 1177 (Alaska 1980).
 
 
 72
 Therefore, in the present case, under the total course of conduct of the parties and based on all of the evidence submitted to the District Court, the District Court correctly held that CNB had a superior security interest to Hoesch in W & B's inventory, accounts receivable, and proceeds of sale and, thus, there was no conversion by CNB of assets or property of Hoesch.
 
 
 73
 The judgment of the District Court is affirmed.
 
 
 74
 Petry testified at the hearing that she was unable to lift anything heavy or perform strenuous work because of continuous back pain and problems with her left wrist. She further stated that after her husband's death, she had a drinking problem, but that she no longer drank as much because she was taking medication for pain.
 
 
 75
 Subsequent to the hearing, the ALJ received medical records and reports from Dr. James H. Coretti, an orthopedic surgeon, who had performed surgery on Petry's left wrist on July 11, 1979 for release of stenosing tenosynovitis. Also received after the hearing were medical records and reports of Petry's hospitalization from September 21 through October 3, 1979, when a myelogram was performed and the final diagnosis was possible ruptured lumbar disc and possible failed back syndrome. Conservative treatment was recommended. In December 1979, Dr. Walker, Petry's treating physician, reiterated his earlier opinion that Petry was disabled. The exhibits received subsequent to the hearing were included in the materials sent to Dr. Bates, the medical advisor, by the ALJ.
 
 
 76
 On appeal, Petry raises three issues: 1) whether the ALJ improperly delegated his decision-making authority to the medical advisor; 2) whether the Secretary's decision is supported by substantial evidence, and 3) whether she was prejudiced by a lack of counsel at the hearing before the ALJ.
 
 
 77
 In order to establish disability, a widow must show that her impairment or impairments, singly or in combination, meet or are medically equivalent to an impairment listed at 20 C.F.R. Sec. 404.1501-1539, Appendix to Subpart P (1980). Only medical evidence is relevant to a widow's disability determination; the age, education and work experience of the claimant are not to be considered. 20 C.F.R. Sec. 404.1577 (1980). In the instant case, the ALJ adopted the conclusion of Dr. Bates that Petry's impairments, either singly or in combination, did not meet or were not the medical equivalent of a listed impairment. Consequently, the ALJ concluded that Petry's impairments were not sufficient to preclude her from engaging in gainful activity, and thus she was not under a disability as defined by Sec. 223(d)(1)(B) of the Social Security Act, 42 U.S.C. Sec. 423(d)(1)(B).
 
 
 78
 The ALJ relied upon 20 C.F.R. Sec. 404.1516(b) (1980) in determining that he was bound by the conclusion of the medical advisor on the issue of whether Petry's impairments met or equaled the listed impairments. Section 404.1516 provides:
 
 
 79
 Any decision made under Sec. 404.1502, Sec. 404.1504, or Sec. 404.1539 as to whether an individual's impairment or impairments are medically the equivalent of an impairment listed in the appendix to this Subpart P, shall be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including a medical judgment furnished by one or more physicians designated by the Secretary, relative to the question of medical equivalence. A 'physician designated by the Secretary' shall include a physician in the employ of or engaged for this purpose by the Administration, the Railroad Retirement Board, or a State agency authorized to make de erminations of disability.
 
 
 80
 Petry argues that the ALJ improperly delegated his decision-making authority to the medical advisor, Dr. Bates. It is indisputable that the ALJ considered himself 'bound' by the determination of the medical advisor. In evaluating the evidence, the ALJ stated:
 
 
 81
 The test for whether or not the claimant has a listed impairment or one that is medically the equivalent of a listed impairment under the Regulations is within the sole and exclusive determinative power of a 'physician designated by the Secretary'. In this instance the physician approved by the Secretary for such purposes was Dr. Richard C. Bates, a board certified internist, who is employed as a medical advisor to the Bureau of Hearings and Appeals.
 
 
 82
 * * *
 
 
 83
 * * *
 
 
 84
 As was stated heretofore the test in these cases is whether or not the claimant's impairments meet or equal the listings prescribed by the Secretary. Further, whether or not a person meets or equals the Listings is to be determined by 'a physician designated by the Secretary'. Here the physician designated by the Secretary. [sic] Dr. Richard C. Bates, has concluded after studying the pertinent medical exhibits and testimony of the claimant, that the claimant's impairments do not meet or equal the Listings. The Administrative Law Judge is bound by Dr. Bates' conclusion on this issue.
 
 
 85
 The ALJ, quite simply, erroneously considered himself to be bound by the medical advisor's determination. Section 404.1516(b) states that the decision of whether an individual's impairment or impairments are medically the equivalent of a listed impairment is to be based on medical evidence, including a medical judgment furnished by at least one physician designated by the Secretary. Nothing in the language of Sec. 404.1516(b) supports the ALJ's position; rather, the plain language indicates that the medical advisor's opinion is to be weighed in the overall evaluation of the evidence.
 
 
 86
 Petry relies upon Woodard v. Schweiker, 668 F.2d 379 (8th Cir. 1981), which also was an appeal from a district court judgment affirming the denial of disabled widow's benefits. As in the present case, the ALJ had stated that he would be 'bound' by the medical advisor's response. The Eighth Circuit, in reversing the district court judgment stated:
 
 
 87
 The ALJ's use of a medical advisor in this fashion is disturbing for three reasons. First, and most importantly, the Court finds itself unable to review the factual findings of the ALJ, adopted by the Secretary, because they were not in fact the findings of the ALJ. The ALJ, by expressly agreeing to be 'bound' by the medical advisor's determination as to whether Woodard is 'impaired,' clearly abdicated his fact-finding and decision-making role. The courts have approved the use of medical personnel to serve as neutral advisors in both wage earner and widow's disability cases. Their purpose is to explicate complex medical problems and, in some instances, to render an independent opinion on the evidence. See Richardson v. Perales, 402 U.S. 389, 408, 91 S. Ct. 1420, 1430, 28 L.Ed. 2d 842 (1971); Bailey v. Califano, 614 F.2d 146, 150 (8th Cir. 1980); Sullivan v. Weinberger, 493 F.2d 855, 860-861 (5th Cir. 1974), cert. denied, 421 U.S. 967, 95 S. Ct. 1958, 44 L.Ed. 2d 455 (1975). Medical advisors are not appointed to functionally 'replace' the ALJ. Although the ALJ in this case alluded to his limited medical expertise, that was not a sufficient reason for him to abstain from weighing the conflicting medical evidence in the case, including the opinion rendered by the medical advisor.
 
 The court in Woodard continued:
 
 88
 We have held that the written reports of medical advisors who have not personally examined the claimant 'deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.' Landess v. Weinberger, 490 F.2d 1187, 1190 (8th Cir. 1974). The ALJ's view of the evidence directly contravened this principle. See Itteilag v. Richardson, 339 F. Supp. 1218, 1222 (D.R.I. 1972).
 
 
 89
 Similarly, in Sherrill v. Secretary of HHS, 757 F.2d 803, 805 (6th Cir. 1985), also a widow's insurance benefits case, this court stated that, in determining the question of substantiality of evidence, the testimony of a medical advisor is entitled to less weight than the reports of any other physicians who examined the claimant over a period of time.
 
 
 90
 We agree with the court in Woodard that the ALJ improperly gave controlling weight to the opinion of a medical advisor. We are also concerned that the ALJ's reliance on Dr. Bates' post-hearing report denied Petry a full and fair hearing. See Allison v. Heckler, 711 F.2d 145, 147 (10th Cir. 1983) ('An ALJ's use of a post-hearing medical report constitutes a denial of due process because the applicant is not given the opportunity to cross-examine the physician or to rebut the report'); Townley v. Heckler, 748 F.2d 109, 114 (2d Cir. 1984) ('a disability benefits claimant has a right to cross examine the author of an adverse report and to present rebuttal evidence.')
 
 
 91
 The ALJ, in evaluating the evidence, did not discuss the medical evidence that was presented at the hearing, presumably because of the mistaken conclusion that he was bound by the medical advisor's opinion. Consequently, we do not reach the question of whether the Secretary's decision is supported by substantial evidence because we find that the decision was not reached after a proper consideration of all the evidence in the record. See Woodard, supra, at 372.
 
 
 92
 Petry's third argument on appeal is that she was prejudiced by a lack of counsel at the hearing before the ALJ. At the beginning of the hearing, the ALJ asked:
 
 
 93
 Mrs. Petry, in the notice of hearing that I mailed to you advising you of your right to be represented in this proceeding, I assume by the fact that you are here by yourself you want to proceed with the hearing without representation?
 
 
 94
 Petry responded: 'Yes, sir.' The ALJ then explained the purpose and format of the hearing. Petry now argues that it is not clear from the record that she understood the nature of the proceedings, nor that she was aware of what effective counsel could do on her behalf, nor that she might have been able to have counsel appointed without paying a retainer. She contends that counsel would have been more effective in establishing her emotional instability and in objecting to the use of the medical advisor. Petry relies upon Webb v. Finch, 431 F.2d 1179 (6th Cir. 1970), a disability benefits case in which counsel for claimant represented at oral argument that there was additional evidence available which might produce a different result. The court held that in view of counsel's representations, and because in the hearing before the examiner the claimant sought to represent himself with obvious ineffectiveness, the case would be remanded to the Secretary for taking additional testimony. Webb was distinguished, however, in Perry v. Richardson, 440 F.2d 677, 678 (6th Cir. 1971):
 
 
 95
 There is no claim here that she [claimant] has any additional evidence to offer if the case were remanded. Her only claim here is that an attorney could have done a better job of cross-examining. . . .
 
 
 96
 Here, Petry has only made the allegation that additional evidence could possibly have been obtained, perhaps by obtaining an evaluation by a psychologist or psychologist. This is significantly different from the situation in Webb, where counsel represented that additional evidence was actually available. The instant case is more like that of Perry, where the claimant alleged that 'an attorney could have done a better job.' Accordingly, we hold that Petry was not prejudiced by a lack of counsel to the extent that a remand is required on this issue.
 
 
 97
 For the reasons stated, we reverse and remand the district court judgment with instructions to return it to the Secretary for further proceedings in accordance with this opinion.
 
 
 
 [1]
 20 C.F.R. Secs. 1501-1539, Appendix to Subpart P (1980). #e examination was performed by Dr. Eugene Wiley; Petry's blood pressure was 1 72/110 and the examination revealed an enlarged liver. X-rays of the lumbosacral spine and nerve conduction studies were normal. From April 23 through May 2, 1979, Petry was hospitalized for back pain under the care of Dr. A. J. Walker. Petry was discharged with a final diagnosis of left trochanteric bursitis, lumbar neuro adhesions, and degenerative osteoarthritis of the spine. On August 30, 1979, Dr. Walker stated that Petry was unable to maintain gainful employment due to a back injury and surgery, and he doubted that she would ever be able to assume continual employment